UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA

_____

CARTER MASON, individually and )
on behalf of all others similarly situated, ) **Civil Action No. 16-cv-02867**
)
Plaintiff, )
) **SECOND AMENDED**
v. ) **CLASS ACTION**
) **COMPLAINT**
MIDLAND FUNDING, LLC, )
ENCORE CAPITAL GROUP, INC., ) **Jury Trial Demanded**
MIDLAND CREDIT MANAGEMENT, INC., )
and COOLING & WINTER LLC, )
)
Defendants. ) **FILED VIA ECF**
_____)

Plaintiffs Carter Mason, Sean Huffman, Jorge Vega, Jacqueline Rooks, and

Anita Burnett, individually and on behalf of all others similarly situated, by their

undersigned attorneys, allege as follows in this Amended Class Action Complaint

against defendants Encore Capital Group, Inc., including wholly owned

subsidiaries Midland Credit Management, Inc. ("MCM"), Asset Acceptance

Capital Corp. ("AAC"), Asset Acceptance LLC, and Midland Funding, LLC

("MF") (collectively "Encore Capital"), and Cooling & Winter LLC (f/k/a

Frederick J. Hanna & Associates, P.C.) ("C&W"), Frederick J. Hanna, Joseph C.

Cooling, and Robert A. Winter  These allegations are made on information and

belief, and pursuant to the investigation of counsel.

## NATURE OF THE CASE

### Overview

1.     Encore Capital purchases vast amounts of consumer debt from creditors for an average of three cents on the dollar.  These accounts are low-priced because the alleged debts are unsupported by evidence, and frequently wrong (incorrect debtor, wrong amounts, etc.), so that the debt can never be proven and are, therefore, uncollectable.

2.     Encore Capital and its attorneys, such as C&W, nevertheless file scattershot consumer debt collection lawsuits in state courts throughout the country.  Defendants do this in order to mislead consumers into believing that Encore Capital actually has admissible evidence, and that it intends to take its claims to trial.

3.     In fact, Encore Capital does not intend to bring these lawsuits to trial. Instead, acting in bad faith, Encore Capital expects that the law suits will coerce consumers into giving it money it cannot prove it is owed.  The purchase agreements for the accounts that Encore Capital purchases specifically eschew the accuracy of any records that are transferred to Encore Capital in association with the accounts, placing Defendants on notice that they will never be able to prove the existence of these debts.

4.     For those consumers who are not coerced by Defendants' filing of a lawsuit against them, Encore Capital seeks and unlawfully obtains default judgments to which it is not entitled, as it never possessed or reviewed sufficient evidence to prove a debt.  This scheme works against the usually unsophisticated consumer-debtors, because the consumers do not recognize Encore Capital's subsidiaries, never having done business with them, and thus fail to appear. Encore Capital then obtains default judgments, often relying on materially false and misleading affidavits.  These default judgments are then used to coerce consumers into settlement or converted to wage garnishments.

5.     For those few consumers who answer the default judgment lawsuits, Encore Capital invariably withdraws its complaint.

**The Consumer Financial Protection Bureau Unravels The Scheme**

6.     Encore Capital's scheme was unraveled by a Consumer Financial Protection Bureau ("CFPB") investigation, which resulted in a Consent Order announced on September 9, 2015 (the "Consent Order"), where Encore Capital agreed to pay a $10 million fine and up to $42 million of restitution.  Based on its investigation, the CFPB issued numerous findings of fact describing Encore Capital's practices.

7.     In the first part of Encore Capital's scheme, Encore Capital's

3

purchasing arm, MF, or subsidiary AAC, purchases portfolios of purported debts that each contains thousands of charged-off consumer credit and telecommunications (cell phone) accounts.  From 2009 to 2015, Encore paid about $4 billion for approximately 60 million consumer accounts with a total face value of $128 billion, or three cents on the dollar.

8.     Encore Capital does not verify its consumer debt by examining the actual business records of the initial creditor.  For this reason, Defendants cannot prove a prima facie case against the alleged debtors.  Even worse, many of the sales agreements with the creditor expressly inform Encore Capital that there are problems with the accounts, such as being past the limitations period, being disputed, or lacking sufficient evidence for prosecution.

9.     Encore Capital, nevertheless, files consumer debt collection lawsuits on debts consumers do not owe and that Encore Capital could not ever prove, intending to either obtain a default judgment or coerce the consumer into settlement.  While Encore Capital represents that it "intends to prove its claims, if contested[,] . . . [i]n truth and in fact, in numerous instances, Encore does not intend to prove its claims, if contested. . . .  These representations are material because they are likely to affect a Consumer's choice or conduct regarding whether to pay the Debt or contest the lawsuit and are likely to mislead Consumers acting

reasonably under the circumstances."[1]

10.    In order to further give the false impression that Encore Capital can prove its claims, Defendants file materially false and deceptive affidavits in support of the debt collection lawsuits.  These affidavits are designed to deceive the reader into believing Encore Capital has personal knowledge of the necessary evidence to prove its claims through a review of its own business records.  The CFPB's Consent Order revealed that Encore Capital's affiants do not have such personal knowledge, nor do they review the business records they claim to have reviewed when the affidavits were filed.  Encore Capital's affidavits also misquote the Fair Debt Collection Practices Act ("FDCPA") in a manner that has been found to be materially deceptive by numerous federal courts and by the CFPB.

11.    Encore Capital conspires with its outside attorneys, including C&W, to ensure Defendants obtain a default judgment.  Defendants' scheme takes advantage of the fact that unsophisticated consumers rarely show up to contest such lawsuits.  Defendants then use these fraudulently obtained default judgments to coerce settlements with consumers, or garnish their wages, never having evidence that the consumers owe them anything.

---

[1]  Consent Order, ¶¶ 82–84, annexed hereto as Exhibit A.

## JURISDICTION AND VENUE

12.    All Defendants conduct business in the State of Georgia.  Venue is predicated on the residence of Plaintiffs and on the fact that Defendants conduct business in this District.

13.    This Court has subject matter jurisdiction under 28 U.S.C. §§ 1331 and 1337, and under 15 U.S.C. § 1692k(d), which provides that "An action to enforce any liability created by this subchapter may be brought in any appropriate United States district court, without regard to the amount in controversy . . . ."

## PARTIES

### Plaintiffs

14.    Plaintiff Carter Mason is a resident of the State of Georgia.  At the time of the events described herein, Mr. Mason resided in Lilburn, Gwinnett County, Georgia.  Mr. Mason is a consumer as the term is defined by 15 U.S.C. § 1692a(3).  One or more of the Defendants initiated at least one action against Mr. Mason alleging claims related to consumer debt.

15.    Plaintiff Sean Huffman is a resident of the State of Ohio, and was so at the time of the events described herein.  Mr. Huffman is a consumer as the term is defined by 15 U.S.C. § 1692a(3).  One or more of the Defendants initiated at least one action against Mr. Huffman alleging claims related to consumer debt.

6

16.    Plaintiff Jorge Vega is a resident of the State of Georgia, and was so at the time of the events described herein.  Mr. Vega is a consumer as the term is defined by 15 U.S.C. § 1692a(3).  One or more of the Defendants initiated at least one action against Mr. Vega alleging claims related to consumer debt.

17.    Plaintiff Jacqueline Rooks is a resident of the State of Georgia, and was so at the time of the events described herein.  Ms. Rooks is a consumer as the term is defined by 15 U.S.C. § 1692a(3).  One or more of the Defendants initiated at least one action against Ms. Rooks alleging claims related to consumer debt.

18.    Plaintiff Anita Burnett (formerly, Anita Pfister) is a resident of the State of Georgia, and was so at the time of the events described herein.  Ms. Burnett is a consumer as the term is defined by 15 U.S.C. § 1692a(3).  One or more of the Defendants initiated at least one action against Ms. Rooks alleging claims related to consumer debt.

**Defendant Midland Funding, LLC**

19.    Defendant Midland Funding, LLC is a Delaware limited liability company that transacts business in the State of Georgia or contracts to supply services in the State of Georgia.  MF has done business in Georgia under the name Midland Funding of Delaware, LLC.  MF maintains offices at 3111 Camino Del Rio North, Suite 103, San Diego, California 92108.  MF is a subsidiary of Encore

Capital Group, Inc.

20.     MF buys charged-off consumer-credit accounts from either the originating creditor, or from another entity involved in purchasing such accounts, and then retains these accounts so that a corporate affiliate can collect from consumers the amounts allegedly owed on these accounts.  MF thus collects, or attempts to collect, directly or indirectly, debts allegedly owed on consumer-credit accounts that it did not originate.

21.     MF has no employees.  All acts performed for or on behalf of MF are performed by employees of Encore Capital Group, Inc. (or of one of the other subsidiaries thereof).  In particular, employees of Encore Capital Group, Inc. (or of one of the other subsidiaries thereof) are responsible for hiring and directing collection lawyers to pursue collection of charged-off receivables, including filing lawsuits, in MF's name.

**Defendant Midland Credit Management, Inc.**

22.     Defendant Midland Credit Management, Inc. is a Kansas corporation that maintains offices at 3111 Camino Del Rio North, Suite 103, San Diego, California 92108.  MCM is a wholly owned subsidiary of Encore Capital Group, Inc.

23.     MCM engages in the business of collecting debts allegedly owed on

charged-off consumer-credit accounts that have been purchased by corporate affiliate MF. MCM collects, or attempts to collect, alleged debts from consumers throughout the country, including in the State of Georgia. MCM thus regularly attempts to collect debts alleged to be due to another.

24.     MCM has little or no net worth. MCM's revenues are amalgamated into Encore Capital Group, Inc.'s financial reporting as Encore Capital Group, Inc.'s own revenue. All acts performed for or on behalf of MCM are performed by employees of Encore Capital Group, Inc.

**Defendant Encore Capital Group, Inc.**

25.     Defendant Encore Capital Group, Inc. is a public company with the stock ticker "ECPG" on the NASDAQ Stock Exchange. It is a Delaware corporation with offices at 3111 Camino Del Rio North, Suite 103, San Diego, California 92108. It does business in this District, including through its wholly owned operating subsidiaries MF, MCM, AAC, and Asset Acceptance LLC.

26.     Over the time period relevant here, Encore Capital Group, Inc. has recognized revenues exceeding $5 billion dollars. In 2015 alone, it recognized more than $500 million in revenue from its consumer debt collection operations in the United States, as reported in its Form 10-K for the year 2015, filed with the Securities and Exchange Commission on February 24, 2016 ("ECPG 2015 10-K").

27.    Encore Capital Group, Inc. controls and participates in the debt collection activities in question.  Specifically, it (1) secures funding from investors and lenders for the purchase of charged-off receivables to which MF takes title, (2) formulates the collection strategies employed by the Defendants herein, and (3) participates in the debt collection activities relevant here.  Encore Capital Group, Inc. thus collects, or attempts to collect, directly or indirectly, debts allegedly owed on consumer-credit accounts that it did not originate.

28.    As Encore Capital Group, Inc. describes itself in its securities filings, "[w]e purchase portfolios of defaulted consumer receivables at deep discounts to face value and manage them . . . . Through certain subsidiaries, we are a market leader in portfolio purchasing and recovery in the United States . . . ."  (ECPG 2015 10-K, at 34).

29.    Encore Capital Group, Inc.'s securities filings also make clear that it both designs and implements the collection strategies utilized against consumers such as Plaintiffs:

> We believe that success in our portfolio purchasing and recovery business depends on our ability to establish and maintain an information advantage. Leveraging an industry-leading financially distressed consumer database, our in-house team of statisticians, business analysts, and software programmers have developed, and continually enhance, proprietary behavioral and valuation models, custom software applications, and other business tools that guide our portfolio purchases. Moreover, our collection channels are informed

10

by powerful statistical models specific to each collection activity, and each year we deploy significant capital to purchase credit bureau and customized consumer data that describe demographic, account level, and macroeconomic factors related to credit, savings, and payment behavior.

*      *      *

During portfolio valuation, we use an internally developed and proprietary family of statistical models that determines the likelihood and expected amount of payment for each consumer within a portfolio. Subsequently, the expectations for each account are aggregated to arrive at a portfolio-level liquidation solution and a valuation for the entire portfolio is determined. During the collection process, we apply a number of proprietary operational frameworks to match our collection approach to an individual consumer's payment behavior

(ECPG 2015 10-K, at 3).

30.     A key component of the collection methodology devised and actively promulgated by Encore Capital Group, Inc. is the use of lawsuits filed against consumers in state courts, such as those that Defendants have prosecuted against Plaintiffs herein:

Despite our efforts to reach consumers and work out a settlement plan, only a small number of consumers who we contact choose to engage with us. Those who do are often offered discounts on their obligations or are presented with payment plans that are intended to suit their needs. However, the majority of consumers we contact do not respond to our calls or our letters and we must then make the decision about whether to pursue collections through legal action.

*      *      *

When we decide to pursue legal action, we place the account into our

11

internal legal channel or refer them to our network of retained law firms.

(ECPG 2015 10-K, at 5).[2]

31.     In fact, all of the conduct described above in Paragraphs 28–30 is performed by Encore Capital Group, Inc.'s subsidiaries, including those named as Defendants herein.   Encore Capital Group, Inc. simply does not recognize the conduct of those entities as being legally distinct from its own conduct.

32.     Encore Capital Group, Inc. and its subsidiaries named as Defendants herein share a unity of interest and ownership.   Encore Capital Group, Inc. shares common officers with its subsidiaries.   (Ex. 10.5 to ECPG 10-Q filed May 10, 2016, at signature page no. 1).[3]   Encore Capital Group, Inc. includes its subsidiaries as co-signatories when securing financing for these corporate entities' collective collection activities.   (Ex. 10.4 to ECPG 10-Q filed May 10, 2016, at signature page no. 5).

---

[2]  The above-quoted language in the preceding paragraphs is not unique to Encore Capital Group, Inc.'s recent securities filings.  Indeed, its securities filings from past years reflect Encore Capital Group, Inc.'s direct participation in all aspects of the collection activities involving its subsidiaries, including those named as Defendants herein.  (*See, e.g.*, ECPG 10-K for the year 2012, at 4).

[3]  *See also* Stip. & Consent to Issuance of Consent Ord., at 4, *In re Encore Capital Grp., Inc.*, No. 2015-CFPB-0022 (Sept. 3, 2015) (signed by Kenneth A. Vecchione, President and CEO of Encore Capital Group, Inc., on behalf of Encore Capital Group, Inc., MF, MCM, and AAC).

33. With MCM having little or no net worth, and MF having no employees, they were never intended to exist as standalone corporate entities. The only motivation behind Encore Capital's corporate form is to insulate Encore Capital Group, Inc. from liability under relevant law, including the FDCPA.

34. In addition to its direct participation in the collection activities against consumers such as Plaintiffs, Encore Capital Group, Inc. has continuously conducted business in this District in connection with its longstanding and ongoing credit-procurement dealings with Atlanta-based financial institution SunTrust Bank. (*E.g.*, Ex. 10.4 to ECPG 10-Q filed May 10, 2016; Ex. 10.4 to ECPG 10-Q filed Aug. 10, 2015; Ex. 10.86 to ECPG 10-K filed Feb. 25, 2014; Ex. 10.12 to ECPG 10-Q filed Aug. 8, 2013).

35. Encore Capital Group, Inc. is estopped from arguing that its corporate organization means it cannot be held liable for the debt-collection conduct of its subsidiaries, in light of the holding in *Fuller v. Midland Credit Management Inc.*, No. 11 C 5111, 2014 U.S. Dist. LEXIS 28462, at *22–30 (N.D. Ill. Mar. 6, 2014) (Lefkow, J.) (piercing the corporate veils of MF and MCM, and holding Encore Capital Group., Inc. liable under FDCPA for alleged debt-collection violations conducted in MCM and MF's names).

**Defendants Asset Acceptance Capital Corp. and Asset Acceptance LLC**

36.    Defendant Asset Acceptance Capital Corp. ("AAC") maintains its principal place of business in Warren, Michigan.   AAC is a wholly owned subsidiary of Encore Capital Group, Inc., pursuant to an acquisition that concluded in June 2013.   Until being acquired, AAC was traded on the NASDAQ under the ticker "AACC."   In a securities filing filed with the Securities and Exchange Commission in connection with that acquisition, AAC was described as "a leading purchaser and collector of charged-off consumer debt."   (ECPG 424B3 filed May 6, 2013, at 12).

37.    As of the time of the 2013 acquisition, Asset Acceptance LLC was a wholly owned subsidiary of AAC, and thus became a wholly owned subsidiary of Encore Capital Group, Inc. when that acquisition concluded.

38.    AAC and Asset Acceptance LLC (collectively, "Asset Acceptance") engage in the business of collecting debts allegedly owed on charged-off consumer-credit accounts.   AAC and Asset Acceptance LLC thus collect, or attempt to collect, directly or indirectly, debts allegedly owed on consumer-credit accounts that they did not originate.

39.    AAC has formulated, and directly participated in, the collection strategies utilized by Asset Acceptance LLC as its operating subsidiary.   As stated

in its Form 10-K for the year 2012, filed with the Securities and Exchange Commission on March 7, 2013 ("AACC 2012 10-K"), AAC has used "analytically driven models [that] consider certain characteristics of [each] prospective portfolio [of charged-off accounts], historical analysis of similar portfolios, estimated potential recoveries, [and] estimated collection expenses and credit attributes. In addition, we also consult with our collections management to help ascertain collectability and potential collection and legal collection strategies." (AACC 2012 10-K, at 5).

40. With regard to litigation-based debt collections, AAC has stated as follows in securities filings:

> We analyze purchased accounts to identify those eligible for our legal process at both the time of purchase and throughout the collection cycle. Accounts are analyzed using a proprietary suit selection methodology to determine whether we believe the debtor has the ability but not the willingness to pay. Our suit selection methodology considers various attributes including the applicable statute of limitations, credit score, employment status and the state in which the debtor resides, together with other proprietary factors we believe help us assess the debtors' ability to satisfy their obligations. Our methodology also incorporates calculations of our projected costs and economic return to determine whether an account is appropriate for the legal collection process. Once accounts are selected, we transfer them into our legal collections channel.

(AACC 2012 10-K, at 8).

41. In January 2012, Asset Acceptance LLC, as a wholly owned

subsidiary of AAC, was fined $2.5 million in conjunction with a Consent Decree with the Federal Trade Commission for wrongful debt collection practices in violation of the FDCPA and the Fair Credit Reporting Act ("FCRA"), 15 U.S.C. § 1681 et seq.[4]   The conduct of Asset Acceptance LLC has never been legally distinct from that of AAC.  Indeed, in the CFPB's September 2015 Consent Order against Encore Capital Group, Inc. and its subsidiaries, all wrongful conduct of Asset Acceptance LLC was attributed to AAC.[5]

42.     Based upon Asset Acceptance LLC's current status as a wholly owned subsidiary of Encore Capital, and upon information and belief, all acts performed for or on behalf of Asset Acceptance LLC have since June 2013 been performed by employees of Encore Capital Group, Inc.  In particular, Encore Capital Group, Inc. has since June 2013 been responsible for hiring and directing collection lawyers to pursue collection of charged-off receivables (including filing lawsuits) in Asset Acceptance's name.

43.     At all times relevant here, Asset Acceptance LLC has been a mere instrumentality of AAC or of Encore Capital Group, Inc.   Further, Asset Acceptance LLC has been used by AAC and/or Encore Capital Group, Inc. to

---

[4] *See* Compl., Consent Decree, *United States v. Asset Acceptance, LLC*, No. 8:12-cv-00182-JDW-EAJ (M.D. Fla. Jan. 30–31, 2012), Dkt. Nos. 1, 4.

[5] *See* Consent Order, Pt. I, & ¶¶ 26, 49, 70–72, 98, 120–122.

commit wrong, including against Plaintiffs herein.  Finally, Plaintiffs have suffered unjust loss and injury as a result of said wrongdoing.

**Defendant Cooling & Winter LLC**

44.    Defendant Cooling & Winter LLC (f/k/a Frederick J. Hanna & Associates, P.C.) is a law firm, located at 1355 Roswell Rd #240, Marietta, GA 30062, that has been retained by Encore Capital to collect on consumer debt. Pursuant to Encore Capital's retention of C&W, C&W files collection actions in, among other jurisdictions, Georgia courts.

45.    Upon information and belief, C&W is the successor in interest to Frederick J. Hanna & Associates, P.C.'s legal business, and amounts to a mere continuation of the law practice formerly known as Frederick J. Hanna & Associates, P.C.

46.    C&W's name and managing partners are Defendants Joseph C. Cooling and Robert A. Winter, both of whom were managing partners and minority owners of Frederick J. Hanna & Associates, P.C.  After re-naming the firm to "Cooling & Winter LLC," Defendants Joseph C. Cooling and Robert A. Winter resumed operations on behalf of the same clients, using the same attorneys against the same consumer-defendants.  All of C&W's Georgia-based attorneys were employed by Frederick J. Hanna & Associates, P.C. at the time of C&W's

17

creation.   Further, C&W's Florida operations are overseen by Anthony Mansicalco, the same attorney who managed the Florida operations of Frederick J. Hanna & Associates, P.C.

47.   C&W conducts its business in the exact same location in Marietta, Georgia used by Frederick J. Hanna & Associates, P.C., having changed little but its name.

48.   Upon information and belief, when Frederick J. Hanna & Associates dissolved and C&W was created, all consumers then being targeted by Frederick J. Hanna & Associates, P.C. for debt collection were notified that their alleged debts would thenceforth be collected by C&W.   Without interruption, consumers continued to be contacted by the same individual(s) as had previously contacted him or her, with the change in firm name being the only difference in the collection process.

**Defendant Frederick J. Hanna**

49.   Defendant Frederick J. Hanna, a licensed attorney, is president and principal owner of Frederick J. Hanna & Associates, P.C.   Hanna has regularly collected or attempted to collect, directly or indirectly, debts owed or due or asserted to be owed or due another through consumer-debt-collection litigation, including against Plaintiffs herein.

50.    As set forth in the CFPB's enforcement action against Frederick J. Hanna & Associates, P.C.,[6] Hanna, as president of that law firm, has contributed to the setting of policy and procedures that caused the violations complained of herein.    Further, upon information and belief, Hanna has managed attorney employees at Frederick J. Hanna & Associates, P.C. who committed the violations complained of herein.

**Defendant Joseph C. Cooling**

51.    Defendant Joseph C. Cooling, a licensed attorney, has been managing partner and a minority owner of Frederick J. Hanna & Associates, P.C., and is managing partner and co-owner of C&W.   Cooling has regularly collected or attempted to collect, directly or indirectly, debts owed or due or asserted to be owed or due another through consumer-debt-collection litigation, including against Plaintiffs herein.

52.    As a managing partner at Frederick J. Hanna & Associates, P.C.[7] and C&W both before and after the firm's name change, Cooling has contributed to the setting of policy and procedures that caused the violations complained of herein. Further, upon information and belief, Cooling has managed attorney employees at

---

[6]  *See* Compl. ¶¶ 8, 11, *Consumer Fin. Prot. Bureau v. Frederick J. Hanna & Assocs., P.C.*, No. 1:14-cv-02211-AT (N.D. Ga. July 14, 2014) ("*Hanna*").

[7] *See id.* ¶¶ 9, 11.

Frederick J. Hanna & Associates, P.C. and C&W who committed the violations complained of herein.

**Defendant Robert A. Winter**

53.     Defendant Robert A. Winter, a licensed attorney, has been managing partner and a minority owner of Frederick J. Hanna & Associates, P.C., and is managing partner and co-owner of C&W.   Winter has regularly collected or attempted to collect, directly or indirectly, debts owed or due or asserted to be owed or due another through consumer-debt-collection litigation, including against Plaintiffs herein.

54.     As a managing partner at Frederick J. Hanna & Associates, P.C.[8] and C&W both before and after the firm's name change, Winter has contributed to the setting of policy and procedures that caused the violations complained of herein. Further, upon information and belief, Winter has managed attorney employees at Frederick J. Hanna & Associates, P.C. and C&W who committed the violations complained of herein.

<strong>CLASS ALLEGATIONS</strong>

55.     This action is brought on behalf of Plaintiffs individually and on behalf of all others similarly situated ("the Class") defined as all persons who were

---

[8] *See id.* ¶¶ 10–11.

or are consumers, from January 1, 2009 and continuing through the present (the "Class Period"), whom Defendants threatened to sue or sued, without admissible evidence or the ability to obtain admissible evidence of the consumer's debt. Included in the Class are those consumers against whom, from 2012 to the present, Defendants submitted affidavits to state courts that purported to be based upon personal knowledge of the debt and/or a review of admissible business records demonstrating the debt when the affiant had no such personal knowledge or had not reviewed admissible business records demonstrating the existence of the debt. Also included are consumers against whom Defendants obtained default judgments without being in possession of admissible evidence to prove the consumer debt.

56.     Excluded from the Class are, at all relevant times, the officers and directors of Defendants, members of their immediate families and their legal representatives, heirs, successors or assigns, and any entity in which any Defendant has or had a controlling interest.

57.     C&W, on behalf of the other Defendants, has filed tens of thousands of consumer debt collection lawsuits in the State of Georgia. For example, C&W's total estimated number of collection suits from 2009 through 2013 topped 350,000. While the exact number of Class members can only be determined by appropriate discovery, Plaintiffs believe there are thousands of members of the Class.

Members of the Class may be identified from records maintained by Defendants and may be notified of the pendency of this action by United States mail.

58.    Plaintiffs' claims are typical of the claims of the other members of the Class, as all members of the Class are similarly affected by Defendants' wrongful conduct that is complained of herein.

59.    There are common questions of law and fact affecting members of the Class, which common questions predominate over questions that may affect individual members.  These include the following:

a.  Whether Defendants had sufficient admissible evidence of the existence of the alleged consumer debt;

b.  Whether Defendants brought litigation, or threatened to bring such litigation, against consumers without the intention or ability to actually prosecute the litigation through trial;

c.  Whether Defendants furnished and/or filed materially deceptive affidavits in connection with lawsuits against alleged debtors;

d.  Whether Defendants filed debt collection lawsuits, or default judgment requests, without conducting a reasonable investigation under the circumstances;

e.  Whether Defendants obtained judgments to which they were not entitled under law;

f.  Whether Plaintiffs and the other members of the Class are entitled to damages, including punitive damages, costs, or attorneys' fees for Defendants' acts and conduct as alleged herein, and the proper measure thereof.

60.    Plaintiffs will fairly and adequately represent the Class members. Plaintiffs have no interests that conflict with the interests of other Class members. Plaintiffs have retained counsel competent and experienced in the prosecution of class action litigation.

61.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to redress individually the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

**BACKGROUND**

**The Debt Buying Industry**

62.    Debt buyers like Encore Capital buy charged-off debts for pennies on the dollar and then seek to collect the full face value of the debts for themselves. Information about a purchased portfolio of debts is transmitted to the debt buyer electronically in the form of a spreadsheet.  The spreadsheet contains, among other things, a list of accounts in the portfolio, as well as the consumer's name, Social Security Number, last known address and telephone number, the account number,

charge-off date, date and amount of last payment, and the alleged amount owed.

63.     Debt buyers like Encore Capital purchase consumer debt without recourse and frequently without the primary or supporting documentation to establish the validity of an alleged debt or that it is the lawful owner thereof.  The underlying purchase agreements often leave the debt buyer with no right to obtain, or even request, any of the underlying documentation that would prove an individual consumer's indebtedness, for a specific amount, on a particular account.  When such a right is contractually provided for, it is typically a qualified right, with the debt buyer entitled to exercise it only at substantial cost.

64.     To investigate a consumer's dispute or respond to a request for information about an alleged consumer debt, a debt buyer would have to obtain and review supporting documentation from the original creditor.  That underlying documentation includes, but is not limited to, copies of the original credit card agreements, copies of any credit card statements evidencing the original credit card debts, proof of mailing of such account statements, affidavits of facts evidencing the sale of an account by the original creditor, and affidavits of the purchase and sale of the debts by intermediate debt sellers (*i.e.*, copies of all written assignments as to each account).

65.     Because debt buyers like Encore Capital purchase these long-dormant,

charged-off accounts for pennies on the dollar, and these purchases are on a non-recourse basis, they generally do not receive, and cannot obtain, such documentation.

## Consumer Litigation Under the FDCPA

66.     In many instances, Encore Capital's subsidiaries have acted as a "secondary" debt buyer—*i.e.*, purchased a charged-off account from another debt buyer—and the paperwork reflecting assignments farther up the chain of title have long since been lost.  In order to obtain standing in court, a secondary debt buyer, such as Encore Capital, must first obtain standing by proving that it is the lawful owner and assignee of a given charged-off account.  When a debt buyer lacks a complete chain of title on a charged-off account, it lacks standing to obtain judgment against a consumer for money allegedly owed on that account.

67.     In order to obtain a judgment, the FDCPA requires that a party has reviewed sufficient evidence for a prima facie case, as the act of requesting a judgment creates the impression that the party has evidence proving the amount of the debt on the account for which a judgment will be issued.  The protections extended by the FDCPA exist irrespective of whether the defendant makes an appearance in court.  Specifically, a creditor must prove, among other things, what the terms of the account were, that the consumer actually used the account, what

specific charges and payments led to the balance allegedly owed, and that the consumer was sent and received account statements reflecting these specific charges ("Actual Evidence").

68.    In order to establish that a consumer had a contract with a credit lender, there must be Actual Evidence that the consumer actually used the account, and proof of the exact terms governing that use.  There must also be Actual Evidence itemizing the various purchases and payments the consumer allegedly made, summing to the total amount upon which judgment is sought.

69.    If a party submits an affidavit as evidence demonstrating the existence of a debt, the affiant may only issue the affidavit based upon personal knowledge of the debt gained from having reviewed Actual Evidence of the debt.

70.    When a consumer's failure to timely respond to a debt buyer's debt-collection complaints has allowed the debt buyer to apply for default judgment on its claims, the debt buyer is still subject to the FDCPA's evidentiary requirements in applying for the default judgment.

71.    For example, in April 2014, New York Court of Appeals Chief Judge Jonathan Lippman condemned debt buyers' practice of obtaining default judgments "on the basis of 'robosigned' affidavits containing hearsay allegations

and few if any facts pertaining to the history of the debt at issue."[9]  These are the

very affidavits at issue in this case.

## FACTS

**Encore Capital Purchases Accounts It
Knows Are Untrustworthy and Uncollectable**

72.    Encore Capital does not have a credit card business and does not

extend credit directly to consumers.  Instead it buys debts that other creditors have

found uncollectable.  As the Eleventh Circuit explained: "When the initial buyer of

a debt is unable to collect, the buyer can recoup a fraction of its losses by including

the debt in a portfolio of uncollected debts and selling it down the line to another

debt buyer (a "down-the-line buyer") at an even deeper discount.  The down-the-

line buyer can, in turn, choose whether to engage in collection activities or to sell

the debt further down the line.  Debts that have been repeatedly bought and sold in

this manner are sometimes referred to as 'junk debts.'"[10]

73.    From 2009 to 2015, Encore Capital paid about $4 billion for

---

[9]   Press Release, "Chief Judge Announces Comprehensive Reforms to Promote
Equal Justice for New York Consumers in Debt Cases," issued by the New York
State Unified Courts System on April 30, 2014, and available at
https://www.nycourts.gov/press/PDFs/PR14_03.pdf (last visited on Sept. 5, 2016).

[10]   *Hinkle v. Midland Credit Mgmt., Inc.*, No. 15-10398, 2016 U.S. App. LEXIS
12661, at *4 (11th Cir. July 11, 2016).

approximately <u>60 million</u> consumer accounts with a total face value of <u>$128 billion</u>, or <u>three cents on the dollar</u>.

74.    There is a good reason why Encore Capital's charged-off accounts are available for purchase at such a steep discount: they are sold without the account-level documents—signed cardholder agreements, account statements, and the like—that prove that a particular consumer owes a specific amount on a particular account.  Instead, Encore Capital receives data from the debt seller that was produced long after the actions and events that created the alleged debt, and compiled for the purposes of bringing debt collection litigation against Plaintiffs and the Class ("Litigation Data").  Moreover, Encore Capital knows the debts are unenforceable at the time of purchase, because the sellers expressly tell them so. The sales agreements for accounts that Encore Capital purchases typically contain "as is" clauses that free the sellers from any obligation to assist in proving the validity of individual accounts.

75.    Encore Capital purchases portfolios of charged-off accounts through MF, a Delaware limited liability company that has no employees of its own.

76.    When Encore Capital purchases charged-off accounts from financial services corporations and from other debt buyers, it acknowledges by contract that the purported debts it is acquiring are unprovable.  Thus, Encore Capital also

knows when it purchases portfolios that the information it receives from sellers as to individual charged-off accounts is untrustworthy, and lacks the indicia of reliability necessary to invoke the business records exception to the hearsay rule.

77.    The CFPB, in its proceeding against Encore Capital, noted that Encore Capital's portfolio-purchase agreements typically contained such disavowals of the validity of the alleged debts being purchased.[11]

78.    For example, one purchase agreement between MF and a large credit card issuer specifically informed Encore Capital that the account balances for over 35,000 individual accounts being sold in that transaction were <u>merely approximations</u> that "may not reflect credits for payments made by or on behalf of any obligor prior to the cutoff date."[12]

79.    In another example, the purchase agreement between MF and a large retailer put Encore Capital on notice that some of the accounts are likely past the applicable statutes of limitations for litigation or were previously disputed by consumers.[13]

80.    In a third example, a purchase agreement between Asset Acceptance

---

[11] *See* Consent Order, ¶¶ 24, 32–35.

[12] *Id.* ¶ 24.

[13] *Id.* ¶ 25.

and a large finance company informed Encore Capital that:

> [S]ome Accounts, or certain transactions posted to some Accounts, may be subject to actual or potential claims or disputes by Obligors against one or both of the Sellers or their affiliates. . . [Asset Acceptance] understands that Sellers believe, but have not verified, that statutes of limitation may have run on some, if not all, of the Accounts."[14]

81.    In these purchase agreements, Encore Capital typically makes the recital that it is purchasing the accounts after having conducted an independent evaluation as to the enforceability and collectability of the sold accounts, but this statement is always false.  At no time does Encore Capital ever verify it is in the possession of the necessary evidence to enforce the debts.  It does not examine the terms of the debts by reviewing account agreements, and it does not tally the debts by examining account statements.

**Encore Capital Purchases Accounts Where Sellers**
**Disclaim They Will Produce Evidence of Indebtedness**

82.    In seeking to collect on any alleged debt it has purchased, Encore Capital relies exclusively on the barebones Litigation Data contained in the electronic spreadsheet transferred to it at the time of portfolio purchase.  The only investigation typically made by Encore Capital prior to a debt portfolio purchase has been to review the data file for facial anomalies such as a default date

---

[14] *Id.* ¶ 26.

preceding an account open date or a Social Security Number that is obviously a placeholder (*e.g.,* made up of all the same numbers).[15]

83.     Encore Capital is on notice that certain debt sellers are unreliable and provide unreliable information.  In numerous instances, debt sellers have provided data files to Encore Capital containing inaccurate information as to the identity of the consumer obligated to pay the debt, the age of the debt, the amount of the debt, the interest rate, and other material information about the alleged debt. Nevertheless, Encore Capital has continued to purchase debt from these sellers and prosecute lawsuits based on that debt, undeterred from the unreliability of the documents it receives.[16]

84.     For example, from at least February 2010 to June 2013, one large credit card bank sold Encore Capital over 10,000 individual consumer accounts with data files containing overstated interest rates.  Encore Capital continued to purchase debt from this bank, knowing that records from this bank have been inaccurate to the detriment of the borrowers, without reviewing any account-level documentation to verify that the information being provided by this seller is accurate.

---

[15] *Id.* ¶ 29.

[16] *Id.* ¶ 30.

85.    Even the biggest and most prestigious credit card companies frequently experience rampant and frequent problems with stated balances.  For example, in 2013 Chase and JP Morgan Chase were forced to pay an over $309 million refund to its credit card customers for inaccurate billing related to charges for services they did not receive and incorrect charges for interest and fees for over 2.1 million consumer accounts.[17]

86.    Nevertheless, Encore Capital does not examine actual supporting documentation for the accounts that MF purchases to verify the existence of the alleged debts at issue.  Instead of actual account records, account-portfolio sellers provide Encore Capital with electronic spreadsheets prepared for the purposes of debt collection, and which contain barebones Litigation Data.  While Defendants know that these spreadsheets are specifically created in anticipation of litigation against consumers—and thus are inherently unreliable, and likely inadmissible in a court of law—Defendants rely on these Litigation Data, and only these Litigation Data, in filing and maintaining their lawsuits against consumers.

---

[17]    *See* Press Release, "CFPB Orders Chase and JPMorgan Chase to Pay $309 Million Refund for Illegal Credit Card Practices," issued by the CFPB on September 19, 2013 and available at http://www.consumerfinance.gov/about-us/newsroom/cfpb-orders-chase-and-jpmorgan-chase-to-pay-309-million-refund-for-illegal-credit-card-practices/ (last visited on Sept. 5, 2016).

**Encore Capital Engages In Harassment To Collect On The Accounts**

87.     After MF purchases a charged-off account, MCM's employees begin
the process of compelling the consumer who allegedly owes money on the account
to pay up.   Initially, Encore Capital uses dunning letters and telephone calls to
achieve this goal.   Some alleged debtors pay just to avoid false reports to credit
bureaus or to otherwise avoid harassment or the legal process.

88.     In a section titled "Asset's Harassing Telephone Calls to Consumers,"
the CFPB describes in its Consent Order how, "from 2009 to 2014, [Asset
Acceptance] has called Consumers repeatedly or continuously.   Such calls had the
effect of abusing or harassing consumers or other persons at the called numbers.
For example, [Asset Acceptance] called numerous Consumers more than 20 times
over just one two-day period."

**Encore Capital Brings Law Suits Without Intending To Prosecute Them**

89.     Despite being on notice concerning the inaccuracy of information
produced by debt sellers, Encore Capital has relied upon the barebones Litigation
Data as the basis for its collection efforts and has <u>only</u> attempted to obtain account-
level documentation evidencing the debt in limited circumstance, if at all.   Even
when Encore Capital is in possession of account-level documentation regarding the
debts it has collected, Encore Capital generally did not review the documentation

33

to ensure it was consistent with information in the data file.[18]   In short, Encore

Capital is on notice that it will not be able to prove its debts at trial.

90.    If letters and calls don't cause a consumer to pay, MCM initiates

litigation-based collection efforts anyway.  For accounts as to which the alleged

debtor is a resident of Georgia, MCM refers such accounts to C&W, which then

commences a collection lawsuit in a Georgia state court.

91.    Judge Amy Totenberg of this District best summarized Defendants'

sham lawsuit scheme:

> [A] reasonable inference one can draw from the Bureau's allegations
> is that the [C&W] files lawsuits on a massive scale, not based on any
> legal determination that each lawsuit is warranted, but instead as an
> extension or replacement of dunning letters, to scare debtors into
> paying up.  The least sophisticated consumer could view a lawsuit,
> signed by an attorney, as an indication that a lawyer had in fact
> scrutinized the case and determined that it had legal merit.  In this
> way, the Firm's alleged litigation-mill may plausibly violate § 1692e.
>
> *       *       *
>
> According to the Bureau, most cases ended in a default judgment or
> settlement.   However, in those few cases where the consumer
> responded to the lawsuit, the Firm routinely dismissed the cases.  The
> Bureau reports that since 2009, the Firm voluntarily dismisses about
> 155 cases each week.  The Bureau does not allege the reason for these
> voluntary dismissals.  But the Bureau notes that "consumers who
> retained attorneys were almost four times more likely to have their

---

[18]  Consent Order, ¶ 45.

cases dismissed."[19]

92.    Encore Capital, with the assistance of C&W, has filed tens of thousands of cases in state-court jurisdictions across Georgia, as well as throughout the United States.

93.    When Encore Capital and C&W, or one of its other outside law firms, seek to collect on a charged-off account through a lawsuit in the Georgia state court system, a boilerplate complaint is filed that identifies MF as the rightful owner of an account originated by a credit lender, and that asserts various causes of action.

94.    Most consumers do not timely respond to collection law suits brought against them by debt buyers like Encore Capital.  When consumers do not timely respond to the collection law suits, Encore Capital and its counsel apply for default judgment.  By representing that the amount being sought is a sum certain, they are often able to have each default judgment application processed by a clerk, instead of by a judge.

95.    Because it was impossible (or financially disadvantageous) for Encore Capital to acquire nonhearsay proof of the alleged indebtedness of the consumers whom they sued, Defendants could not meet the evidentiary requirements for

---

[19] *See Hanna*, 114 F. Supp. 3d 1342, 1350, 1369 (N.D. Ga. 2015) (Totenberg, J.).

procuring default judgments under the FDCPA.  They therefore employed a variety of deceptive linguistic tricks in an effort to mislead consumers and courthouse personnel into believing that Encore Capital was actually entitled to judgment in these debt-collection lawsuits.

**Encore Capital Collects On Time Barred Debt**

96.    Encore Capital and C&W fail to review Actual Evidence, such as account-level documents, to determine the age of the accounts they collect, instead relying solely on information in the Litigation Data.  Encore Capital does this, even if it or one of its law firms has been on notice that some of the information in a data file is inaccurate, or where Encore Capital is on notice that some of the debts in a the portfolio are barred by the applicable statute of limitations.

97.    In order to conceal that its debt is time-barred, Encore Capital instructed its collectors to "create urgency" when collecting the time-barred debt through telephone calls.  For example, for one portfolio Encore Capital knew contained a high percentage of time-barred debt, collectors were instructed to "[e]ducate [the] consumer, as to how nonpayment of bill will impact him," by telling him "[i]t is important for me to establish your intentions towards the bill or else it will be taken as your refusal to resolve" after which the account will be "forwarded for further management review" so that "further collection activities

36

will be decided."[20]

98.    In numerous instances from at least July 21, 2011 to March 31, 2013, Encore Capital sent thousands of letters containing time-limited "settlement" offers that failed to disclose that the debt it was collecting was too old for litigation and that implied a legally enforceable obligation to pay the debt.[21]

**Encore Capital's Fraudulent Affidavit Scheme**

99.    Encore Capital's scheme is designed to primarily be a default judgment mill such that no one ever questions Encore Capital's lack of evidence to support its claims.  In order to feign the existence of admissible evidence, Encore Capital often submits materially false and misleading affidavits to state courts. Discussing an identical practice by Encore Capital's largest competitor, Judge George B. Daniels, in the Southern District of New York, observed just a few weeks ago: "according to the express terms of the FDCPA, Defendants had to submit evidence sufficient to establish [the debtor's] liability regardless of whether [the debtor] defended against the collection action."[22]  In blatant violation of the

---

[20]  Consent Order, ¶ 68.

[21]  *Id.* ¶ 69.

[22]  *Toohey v. Portfolio Recovery Assocs., LLC*, No. 15-cv-8098 (GBD), 2016 U.S. Dist. LEXIS 111534, at *19 (S.D.N.Y. Aug. 22, 2016).

law—and contradicting their own affidavits—Encore Capital's affiants do not review such evidence prior to obtaining judgments against consumers.

100.    Encore Capital employees sign between 200 and 400 computer-generated affidavits per day for use in debt-collection actions, without personal knowledge of the accounts, ensuring there is no way for them to properly review the account agreement and numerous account statements that would serve as an evidentiary basis of Encore Capital's alleged debt.[23]

**Encore Capital's Affiants Feign "Personal Knowledge"**
**of Account-Level Documentation**

101.    Encore Capital's affidavits are carefully drafted to appear as if the affiant has actual knowledge of the underlying facts, when in fact, the allegations are based on hearsay.  In each affidavit, attached to the complaint or in support of an application for default judgment, Encore Capital's affiant swears that, among other things, "the statements herein [are] based upon personal knowledge" and that he or she has "access to and ha[s] reviewed the electronic records pertaining to the account . . . ."

102.    Anyone reading this language would have assumed that the affiant was referring to electronic copies of account statements, cardholder agreements,

---

[23]   *Pelzer v. Vassalle*, No. 14-4156, 2016 U.S. App. LEXIS 12640, at *3–4 (6th Cir. July 7, 2016).

and the like.  From the perspective of the unsophisticated consumer, that would be the most obvious interpretation of the phrase "records pertaining to the account." The <u>only</u> reason that a litigant files an affidavit is to offer actual evidence of the facts constituting a prima facie case as to that litigant's claims.

103.   As Judge Totenberg observed:

> [C&W] knew or should have known that the affiant had no personal knowledge of some of the material facts in the affidavit.  According to the [CFPB], for those affidavits received from its debt-buyer clients (as opposed to its creditor clients), the Firm allegedly "did not determine whether any underlying documentation for the debt was available."[24]

104.  In reality, as the CFPB concluded, Encore Capital's affiants' assertions of personal knowledge and review are typically made after "affiants have merely reviewed a computer screen containing the scant information produced by sellers in data files and not after a review of any account[-]level documents such as account applications, terms and conditions of contracts, payment histories, monthly credit card statements, charge slips, or bills of sale reflecting [Encore Capital's] ownership of the account."[25]  It was this very "scant

---

[24]   *Hanna*, 114 F. Supp. 3d at 1370 (citations omitted).

[25]   Consent Order, ¶ 59.

information" that the Eleventh Circuit found insufficient to prove a debt.[26]

105.   As Defendants would have been well aware throughout the Class Period, a debt buyer engages in hearsay under state law when it merely parrots the barebones Litigation Data that have been provided by the seller via electronic spreadsheet at the time of portfolio purchase.   The language of Encore Capital's affidavits would have left any reader with the misimpression that the affiant had actually, personally reviewed actual account-level documentation demonstrating the sum certain alleged prior to signing the affidavit.

**Encore Capital's Affiants Feign Review of
Business Records Demonstrating A Debt**

106.   The CFPB's bombshell allegations in the Consent Order revealed that, while "Encore has routinely submitted affidavits without attaching supporting documentation, in which the affiant swears that he or she has reviewed account-level business records concerning the Consumer's account when that is not the case."[27]

---

[26]   *Hinkle*, 2016 U.S. App. LEXIS, at *28 (internal quotation marks and citation omitted).

[27]   Consent Order, ¶¶ 58–59 (emphasis added); *see also Toohey*, 2016 U.S. Dist. LEXIS, at *26 ("The submission of the affidavit of merit [to a state court] is plausibly misleading and unconscionable conduct in violation of the FDCPA if, as the [complaint] alleges, Defendants did not possess, and the affiant had not reviewed, evidence sufficient to establish [the consumer's] debt when they

107. As the CFPB further explained: "in most instances, these representations [concerning review of business records] have been made when affiants have merely reviewed a computer screen containing the scant information produced by sellers in Litigation Data files and not after a review of any account-level documents such as account applications, terms and conditions of contracts, payment histories, monthly credit card statements, charge slips, or bills of sale reflecting Encore's ownership of the account."[28]

108. In a decision just several weeks ago against Encore Capital, the Eleventh Circuit held that MCM's data summaries—upon which Encore Capital's affidavits are based—are not "sufficient documentation that the debts in fact belonged to [the debtor]."[29]

109. Instead, Encore Capital uses its affidavits to cover up its failure to possess, review, or have personal knowledge of the necessary business records through Defendants' use of a mishmash of confusing jargon and double-speak. For example, it is difficult to imagine how the least sophisticated consumer could

---

submitted the affidavit falsely attesting to a personal review of reliable documentation.").

[28] Consent Order, ¶¶ 58–59.

[29] *Hinkle*, 2016 U.S. App. LEXIS 12661, at *30–31.

41

possibly unravel the following paragraph commonly found in Encore Capital's affidavits:

> I am familiar with and trained on the manner and method by which MCM creates and maintains its business records pertaining to this account. The records are kept in the regular course of business. It was in the regular course of business for a person with knowledge of the act or event recorded, and a business duty to report, to make the record or data compilation, or for a person with knowledge to transmit information thereof to be included in such a record. In the regular course of business, the record or compilation is made at or near the time of the act or event.

110. The preceding paragraph is materially false and deceptive for a litany of reasons. Among other things, the paragraph is designed to conceal that much of the paragraph is attempting to describe the conduct of a third-party, not the conduct of MCM—the <u>only</u> entity specifically mentioned in the paragraph. The paragraph is further deceptive, because it includes disjunctive clauses designed to cover that the affiant actually has no personal knowledge, whatsoever, as to how the specific data about which he is testifying was created or maintained. The paragraph is further deceptive, because it pretends to describe a review of business records that are admissible as evidence when it is actually describing summary electronic data that was <u>not</u> made near or at the time of the actual events described (*i.e.*, the sales and payments that constituted the debt). Those "business records" would be the actual account statements for the alleged debt, which the affiant <u>does not review</u>.

The paragraph is deceptive in that its use of the term "records" is meant to imply "business records" in instances where the documents described are not business records.

**Encore Capital's Affidavits Misquote**
**The FDCPA's "Assumed Valid" Language**

111. The boilerplate language of Encore Capital's affidavits has also misquoted the FDCPA in a manner that has been strongly criticized by courts across the country and, more recently, by the CFPB, for deliberately misquoting a disclosure required by the FDCPA.  Defendants' affidavits often contained the following language:

> It is in the ordinary course of business for plaintiff or its agents to send a validation letter to defendant(s) in accordance with the Fair Debt Collection Practices Act (15 USC § 1692g) setting forth the amount of the debt, identifying plaintiff as the creditor to whom the debt is owed, and notifying defendant(s) that, in accordance with the FDCPA, unless defendant(s) disputes the validity of the debt, or any portion of it, the debt will be assumed valid.

112. The <u>actual</u> statutory language of 15 U.S.C. § 1692g states:

> [A] debt collector shall, unless the following information is contained in the initial communication or the consumer has paid the debt, send the consumer a written notice containing . . . a statement that unless the consumer, within thirty days after receipt of the notice, disputes the validity of the debt, or any portion thereof, the debt will be assumed to be valid **by the debt collector** . . . .  The failure of a consumer to dispute the validity of a debt under this section may not be construed by any court as an admission of liability by the

43

consumer.  (Emphasis added.)

113.   As the CFPB explained in its Consent Order:

[F]rom at least 2011 to 2014, Encore has obtained tens of thousands
of judgments against Consumers by submitting sworn affidavits
representing that the Consumer defendants did not file a timely
written dispute pursuant to Section 809 of the FDCPA and stating that
pursuant to the FDCPA, the Debt is therefore "assumed valid."

    In fact, Section 809(a)(3) of the FDCPA states that a Debt
collector's Notice of Debt must inform a Consumer that Debts will be
'assumed to be valid *by the debt collector*' (emphasis added) if they
are not disputed pursuant to that section.   Section 809(c) of the
FDCPA expressly states that '[t]he failure of a consumer to dispute
the validity of a debt . . . may not be construed by any court as an
admission of liability by the consumer."  15 U.S.C. § 1692g(c).

    In thousands of cases, for which Encore possessed no account-
level documentation evidencing the Consumer's responsibility for the
Debt, Encore obtained a settlement or judgment based solely on an
affidavit referencing the Consumer's failure to dispute the debt.[30]

114.   Removing the statutory words "by the debt collector" when quoting

15 U.S.C. § 1692g is widely regarded as a deceptive practice because it misleads

individuals unfamiliar with the nuances of the FDCPA into wrongly believing that

a consumer's failure to dispute a debt collector's allegation of indebtedness creates

a legal presumption of that allegation's validity.   For that reason, there is a

mountain of case law vilifying this practice.   Further, the CFPB has specifically

---

[30]  Consent Order, ¶¶ 55–57.

reprimanded Encore Capital for its utilization of this deceptive tactic, finding that in at least 35,600 cases nationwide, consumers had paid alleged debts after Encore Capital filed an affidavit misquoting 15 U.S.C. § 1692g, with roughly 6,300 of those violations occurring in cases in which Encore Capital lacked documentation evidencing the consumer's indebtedness.[31]

115.   Misquoting the "assumed valid" language of 15 U.S.C. § 1692g is especially pernicious because it misleads unsophisticated consumers.   Encore Capital's misrepresentation of the FDCPA creates the false impression that, regardless of whether Encore Capital possesses actual documentary proof of an alleged debt, Encore Capital has admissible, dispositive proof of a consumer's indebtedness, simply by dint of the fact that the consumer has not timely disputed Encore Capital's initial assertion of entitlement to judgment.

**Encore Capital Conspires With Debt Sellers To Produce**
**False Or Misleading Affidavits To Be Submitted To Courts**

116.   Recognizing in most instances evidence demonstrating a debt will never be available, Encore Capital negotiates into its debt purchase agreements the ability to request affidavits issued from the sellers that purport to be based on a review of documentation, when they are not.   For example, numerous Encore

---

[31]   *See id.* ¶¶ 53–57, 145.

Capital purchase agreements with debt sellers provide that "[i]n the event Seller does not provide any of the account documents on a particular account, [Encore Capital] may request an affidavit" containing the following language: "The statements in this affidavit are based on the computerized and <u>hard copy records</u> of the Seller. . ." (emphasis added).[32]   Encore Capital knows, however, that debt sellers do not possess any such "hard copy" records when Encore Capital received no records at all.

117.   One Encore Capital senior manager admitted that the purpose of this affidavit clause is "as a safeguard, <u>should documentation not exist</u>, [so] we have some form of evidence from the seller." A director of Encore Capital's debt purchasing department has instructed management to "reinforce that these affidavits are intended to provide documentation <u>when other media is not available.</u>"[33]

118.   Encore Capital has routinely submitted affidavits in which affiants swear that attached documentation relates to individual consumers' accounts.  In many instances, the attached documentation—which sometime included generic credit card agreements created years after the Consumer purportedly defaulted on

---

[32]  *Id.* ¶ 60.

[33]  *Id.* ¶ 61 (emphasis added).

the agreement—does not in fact relate to the consumer being sued.[34]

**Encore Capital Conspired With C&W To**
**Obtain Defaults Without Meaningful Review**

119.  Defendants ultimately conspire to obtain default judgments against alleged debtors, such as Plaintiffs, for the sum certain of debts for which they knew, or should have known, they had insufficient evidence.  The very act of obtaining judgments over debts Defendants could not prove is an inherently deceptive act.

120.  To achieve this end, Defendants take advantage of the fact that most of the consumers sued by Encore Capital are not represented by counsel, nor are they likely to even appear.  Accordingly, Defendants may feign that they are entitled to a judgment by simply applying for a default judgment.  The mere application for this default is deceptive because it represents that Encore Capital had evidence it was actually owed a debt.

121.  Encore Capital's law firms are kept in the dark as to whether a debt seller has specifically disclaimed the accuracy of information in the data file, has notified Encore Capital that documentation is unavailable, or that accounts in the portfolio are disputed or barred by the application statute of limitations.  Further,

---

[34] *Id.* ¶ 63.

they are not furnished with Actual Evidence adding up to the sum certain of the alleged debt.  This makes it impossible for the attorneys to conduct a meaningful attorney review.  As the CFPB described, "Encore has encouraged these law firms to file lawsuits on a large percentage of accounts, prohibited them from contacting previous owners of the Debt for account-level documentation, and discouraged them from requesting account-level documentation Encore did not deem necessary to settle a case or obtain a judgment."[35]

122.   Defendant Cooling & Winter, f/k/a Frederick J. Hanna & Associates, P.C., changed its name within the last year so as not to be associated with the CFPB's successful prosecution of Frederick J. Hanna & Associates for the same conduct as alleged herein.   The CFPB's prosecution ultimately led to the "Stipulated Final Judgment and Order," issued by Judge Totenberg of this District, wherein C&W and its operators paid a civil money judgment of over $3.1 million.[36]

123.   C&W conspired with Encore Capital by abdicating its job as an officer of the court and willfully failing to investigate the claims when it filed

---

[35]  Consent Order, ¶ 48.

[36]  *See* Stipulated Final Judgment & Order, ¶ 13, *Hanna*, No. 1:14-cv-02211-AT (N.D. Ga. Dec. 28, 2015), Dkt. No. 61-1.

complaints on behalf of Encore Capital, secured default judgments in those cases, or even garnished consumers' wages. Encore Capital has placed over 100,000 accounts with C&W, while that firm employed only 16 attorneys. While Encore Capital encourages its law firms to file lawsuits on a large percentage of accounts, it prohibited them from contact with previous owners of the debt for account-level documentation, and discouraged them from requesting account-level documentation Encore Capital did not deem necessary to settle a case or obtain a judgment.[37]

124.  From October 2011 to October 2012, Encore Capital subsidiary Asset Acceptance used a 24-attorney debt collection law firm operating in 12 states to collect over $50 million from alleged debtors. Over that period, those 24 attorneys sued or threatened to bring suit against almost a half million consumers.[38] If each attorney worked 2,000 hours that year, they would have devoted an entirety of just a few minutes to each account from start to finish.[39]

125.  As Judge Totenberg has explained, the CFPB found that "from 2009

---

[37] Consent Order, ¶ 48.

[38] *Id.* ¶ 49.

[39] *See Bock v. Pressler & Pressler, LLP*, 30 F. Supp. 3d 283, 286–87 (D.N.J. 2014) (law firm that represented MF in state-court debt-collection litigation violated FDCPA by filing suit based upon "four-second scan" of complaint).

through 2013, [C&W's] small group of lawyers filed tens of thousands of lawsuits in Georgia each year to recover on allegedly defaulted debt.  The Bureau allege[d], however, that the Firm's lawyers have essentially no meaningful involvement in these lawsuits.  Moreover, according to the Bureau, in these debt-collection lawsuits, the [C&W's] lawyers rely on affidavits, which the Firm and its three partners named in this case knew or should have known were executed by a person without personal knowledge of the facts contained in those affidavits."[40]

126.   Moreover, C&W's conduct has been particularly egregious in this state.  "The [CFPB] estimates that in Georgia alone, [C&W] sued about 78,000 consumers in 2009; about 84,000 in 2010; about 71,000 in 2011; about 57,000 in 2012; and about 60,000 in 2013.  The total estimated number of collection suits from 2009 through 2013 alone topped 350,000 consumers."[41]

127.   Accordingly, Judge Totenberg has already held that the above facts—if true—constitute an FDCPA violation for creating the impression that C&W engaged in meaningful attorney involvement when filing the lawsuits, and a second FDCPA violation for knowingly filing false affidavits.[42]

---

[40]  *Hanna*, 114 F. Supp. 3d at 1348.

[41]  *Id.* at 1349 (internal quotation marks and citation omitted).

[42]  *Id.* at 1367, 1370.

**Defendants' Actions Against Plaintiffs**

Carter Mason

128.   On August 7, 2015, Encore Capital, as a purported assignee of WebBank/Fingerhut Credit, by and through its counsel, M. Quinn McGill, an attorney admitted to practice in Georgia and employed by Frederick J. Hanna & Associates, P.C., a/k/a C&W, filed a Statement of Claim against Mr. Mason in the Magistrate Court of Gwinnett County, Georgia.  The Statement of Claim alleged a claim against Mr. Mason in the amount of $693.32 in principal, plus court costs.[43]

129.   Attached to the complaint filed against Mr. Mason was a document purporting to be an account statement from Fingerhut, which did not list any charges, payments, or reason for the stated $658.32 balance.  Defendants did not include any evidence that the document was placed in the United States mail or that Mr. Mason ever received it.

130.   Also attached to the complaint was an Assignment and Bill of Sale, dated May 2, 2014, that stated certain accounts, described in a "Schedule 1", were assigned from Bluestem Brands, Inc., "for itself and as agent for Santander Consumer U.S.A. to Midland Funding LLC."  No Schedule 1 was attached actually describing the accounts assigned.  Also attached to the complaint was a "Bill of

---

[43]   *See* Complaint, filed August 8, 2016, Exhibit 1 [Dkt. No. 1-1].

Sale" between WebBank and Bluestem Brands, Inc., dated April 28, 2014—just four days prior to the Assignment and Bill of Sale—whereby WebBank assigned the interest in certain unnamed accounts as described in a document also called "Schedule 1."   No Schedule 1 is attached to this document either.   Neither purported assignment identifies any actual accounts that were assigned.[44]

131.   Additionally, attached was a barebones data sheet titled "Field Data" that states at the bottom, "Data printed by Midland Credit Management, Inc. from electronic records provided by Bluestem Brands, Inc., for itself and as agent for Santander Consumer USA ("SCUSA") pursuant to the Bill of Sale/Assignment of Accounts transferred on or about 5/2/2014 in connection with the sale of accounts from Bluestem Brands, Inc., for itself and as agent for Santander Consumer USA ("SCUSA") to Midland Funding, LLC."   The Field Data sheet reflects an "accountopendate" of "2013-08-11," and a "DateLastPurchase" of 2013-08-14, only three days after the account was purportedly opened.[45]   Such purchase histories are indicative of identity theft.

132.   The information listed in the Field Data does not match the information listed in the Actual Evidence issued by Fingerhut.  For example, while

---

[44]   *See id.*

[45]   *See id.*

the actual account statement states a balance of $658.32, the data spread sheet states both a "Sale Amount" and a "chargeOffAmount" of $693.32.   No explanation is provided for this discrepancy between the business records of the initial creditor and Encore Capital's records.

133.   Also attached to the complaint was the "Affidavit of Kory Holst," issued on April 1, 2015 by Kory Holst, a Legal Specialist for MCM.  According to the affidavit, MCM services the account on behalf of MF.  Mr. Holst's affidavit states in part: "I am a competent person over eighteen years of age, and make the statements herein based upon <u>personal knowledge of those account records</u> maintained on plaintiff's behalf." (emphasis added).[46]  This statement is false and misleading, because Mr. Holst did not have personal knowledge of the debt or any Actual Evidence evidencing a debt.

134.   Mr. Holst also states "MCM's [business] records show that the defendant(s) owed a balance of $693.32 as of 2015-03-24."  This statement is false because that balance came from MCM's Litigation Data, which is contradicted by the actual business record of the account statement.

135.   The affidavit goes on to attest: "I have access to and have <u>reviewed the [business records] pertaining to the account</u> and am authorized to make this

---

[46]  *See id.*

affidavit on plaintiff's behalf." (emphasis added).  This statement is false because Mr. Holst obviously did not review the account records, as demonstrated by the discrepancy between the sum certain owed according to those business records and the sum certain attested to in his affidavit.

136.   Further, the affidavit falsely represented that Mr. Holst was "familiar with and trained on the manner and method by which MCM creates and maintains its business records pertaining to this account. . . .  It was in the regular course of business for a person with knowledge of the act or event recorded, and a business duty to report, to make the record or data compilation, or for a person with knowledge to transmit information thereof to be included in such record." However, Mr. Holst lacked personal knowledge regarding how the business records pertaining to Mr. Mason's alleged account were created.  For that statement to be true, Mr. Holst would have to have personal knowledge of Fingerhut's record creation and maintenance policies, which would be the source of the only relevant business records.

137.  Finally, Mr. Holst's affidavit attests that Midland Funding "was assigned all the rights, title and interest to defendant's WEBBANK account XXXXXXXXXXXX4141. . . ."  However, the attached account statement states the "Account Number" as "XXXX-XXXX-XXXX-6160" with a "Customer

Number" of 3462839914."

138.  On August 31, 2015, Mr. Mason answered Encore Capital's complaint, and denied the debt.  Immediately thereafter, on October 2, 2015, Encore Capital dismissed its complaint against Mr. Mason without explanation.

139.  Even though Encore Capital dismissed its complaint against Mr. Mason on October 2, 2015, as of July 22, 2016, Encore Capital was reporting a debt in the amount of $693 to TransUnion.[47]  Encore Capital did so, even though the only business record available concerning the account reflected a different balance.

Sean Huffman

140.  In 2006, Sean Huffman was the victim of identity theft.  Someone stole his credit card information and made thousands of dollars in charges on his Chase Bank branded credit card.  Even though Mr. Huffman lived in Hamilton County, Ohio, the charges were made in Atlanta, Georgia—a place he had never been.  Mr. Huffman promptly reported to Chase that he was a victim of fraud.

141.  On December 10, 2012 Encore Capital, as a purported assignee of Chase Bank USA, N.A., by and through its counsel, Kimberly A. Klemenok and Nevenka Pavlovic, filed a complaint against Mr. Huffman in the Hamilton County

---

[47]  *See* Complaint, Exhibit 2 [Dkt. No. 1-2].

Municipal Court, No. 12CV32163.  The complaint alleged a debt of $5,657.79 in principal, plus court costs and interest.

142.   Attached to the complaint filed against Mr. Huffman was a document purporting to be an account statement issued by Chase for the period March 16, 2011-April 15, 2011, for an account number ending in 2532.  The document did not reflect any charges, payments, or reason for the stated $5,657.79 balance. Encore Capital did not include any evidence that the document was placed in the United States mail or that Mr. Huffman ever received it.

143.   The docket for the action against Mr. Huffman reflects that an attempt of service by certified mail failed, and so the summons and complaint for the lawsuit were simply placed in "Ordinary mail" on December 18, 2012.

144.   According to the Certificate of Service attached to the default judgment motion, on April 12, 2013, Encore Capital moved for default judgment in the amount of $5,657.79, plus interest and costs.  A copy of the motion for default judgment was placed in "regular" United States mail on April 4, 2013.

145.   Also attached to the default judgment motion was an "Affidavit of Alex Plevell," issued on January 13, 2013 by Alex Plevell, a Legal Specialist for MCM.  According to the affidavit, MCM services the account on behalf of MF. Mr. Plevell's affidavit states in part: "I am a competent person over eighteen years

of age, and make the statements herein based upon <u>personal knowledge of those</u> <u>account records</u> maintained on plaintiff's behalf." (emphasis added).   This statement is false and misleading, because Mr. Plevell did not have personal knowledge of the debt or its account records.

146.   Further, the affidavit falsely represented that Mr. Plevell "was familiar with and trained on the manner and method by which MCM creates and maintains its business records pertaining to this account. . . .   It was in the regular course of business for a person with knowledge of the act or event recorded, and a business duty to report, to make the record or data compilation, or for a person with knowledge to transmit information thereof to be included in such record." However, Mr. Plevell lacked personal knowledge regarding how the business records pertaining to Mr. Huffman's account were created.   For that statement to be true, Mr. Plevell would have to have personal knowledge of Chase's record creation and maintenance policies, which would be the source of the only relevant business records.

147.   Also attached to the default motion was a "Bill of Sale" between Chase Bank USA, N.A. and Equable Ascent Financial, LLC, dated May 19, 2011. The document describes how "effective as of the File Creation Date of 06/06/2011 all rights, title and interest of Seller in and to those certain receivables, judgments

or evidences of debt described in the Final Data File, entitled (Account's Primary File Name) attached hereto and made part hereof for all purposes."  The Bill of Sale goes on to say: "This Bill of Sale is executed without recourse except as stated in the Credit Card Account Purchase Agreement. No other representation of or warranty of title or enforceability is expressed or implied."  Neither the Final Data File nor the Credit Card Account Purchase Agreement are attached, nor any other document identifying the transferred accounts.

148.   Also attached to the motion was a "Bill of Sale," between Equable Ascent Financial, LLC and Midland Funding LLC, dated May 14, 2012.  The document states in pertinent part: "Seller does hereby sell, assign and transfer to Buyer, and Buyer does hereby purchase from Seller, all right, title, and interest of Seller in and to the Accounts describing in that certain electronic file named [the rest of the sentence is redacted]."  The document as filed does not name which accounts were transferred, nor does it name another document that describes which accounts were transferred.

149.   On April 12, 2013 a default judgment was entered for Encore Capital in the sum of $5657.79, plus interest and costs.  As of the date of this filing, Encore Capital has garnished at least $3,319.67 from Mr. Huffman's wages.

Jorge Vega

150.   On July 27, 2015, Encore Capital, as purported assignee of Credit One Bank, N.A., by and through its counsel, Jarvis B. Lakemaker, an attorney admitted to practice in Georgia and employed by Frederick J. Hanna & Associates, a/k/a C&W, filed a Statement of Claim against Mr. Vega in the Magistrate Court of Gordon County, Georgia, Case No. 15-1266CS.   The Statement of Claim incorrectly referred to Mr. Vega as "George Vega."   The Statement of Claim alleged a claim against Mr. Vega in the amount of $958.88 in principal, plus court costs.

151.   Attached to the complaint filed against Mr. Vega was the "Affidavit of Sonja Williams," issued on June 3, 2015 by Sonja Williams, a Legal Specialist for MCM.  According to the affidavit, MCM services the account on behalf of MF. Ms. Williams's affidavit states in part: "I am a competent person over eighteen years of age, and make the statements herein based upon personal knowledge of those account records maintained on plaintiff's behalf." (emphasis added).  This statement is false and misleading, because Ms. Williams did not have personal knowledge of the debt or any Actual Evidence.

152. Further, the affidavit falsely represented that Ms. Williams was "familiar with and trained on the manner and method by which MCM creates and

maintains its business records pertaining to this account. . . .  It was in the regular course of business for a person with knowledge of the act or event recorded, and a business duty to report, to make the record or data compilation, or for a person with knowledge to transmit information thereof to be included in such record." However, Ms. Williams lacked personal knowledge regarding how the business records pertaining to Mr. Vega's account were created.  For that statement to be true, Ms. Williams would have to have personal knowledge of Credit One's record creation and maintenance policies, which would be the source of the only relevant business records.

153.   On January 6, 2016, after obtaining a default judgment, Encore Capital, by and through its counsel, Christopher Yarbrough, an attorney admitted to practice in Georgia and employed by Frederick J. Hanna & Associates, a/k/a C&W, filed a garnishment action against Mr. Vega, in the Magistrate Court of Gwinnett County, Georgia, Case No. 16-GM-00109, naming Mr. Vega's employer, Lowes Home Centers, as garnishee.  As of today's date, disbursements totaling $848.31 have been made to Defendants pursuant to this garnishment action.

154.   Mr. Vega has never admitted owing the alleged Credit One debt over which Defendants have sued him and garnished his wages, and denies that he owes this alleged debt.

Jacqueline Rooks

155.   On May 25, 2011, Encore Capital, as purported assignee of Credit One Bank, N.A., by and through its counsel, Clayton D. Moseley, an attorney admitted to practice in Georgia and employed by Frederick J. Hanna & Associates, a/k/a C&W, initiated a collection lawsuit against Ms. Rooks in the Magistrate Court of Fulton County, Georgia, Case No. 11MS130733.  On October 12, 2011, Defendants requested a default judgment in this lawsuit against Ms. Rooks.

156.   Subsequently, on March 20, 2012, a Consent Judgment was entered in this collection lawsuit, for $1,080.33 in principal, plus $76.50 in interest, costs, and attorney fees.

157.   On January 22, 2013, Encore Capital, by and through its counsel, Louis R. Feingold, an attorney admitted to practice in Georgia and employed by Frederick J. Hanna & Associates, a/k/a C&W, filed a garnishment action against Ms. Rooks, in the Magistrate Court of Gwinnett County, Georgia, Case No. 13-GM-01777, naming Ms. Rooks's employer, United Parcel Service, as garnishee. On August 8, 2013, this garnishment action was disposed, with the garnishment having been "Paid In Full" to Defendants after disbursements totaling $712.53 had been made.

158.   Ms. Rooks denies ever having owed the debt over which Defendants sued her and garnished her wages.  She could not afford to retain an attorney to defend her in the aforementioned collection lawsuit or garnishment action.  Once sued, she felt that it was inevitable that Defendants would be able to extract money from her in connection with this alleged Credit One debt, regardless of how vigorously she disputed its validity.

Anita (Pfister) Burnett

159.   On December 4, 2015, Encore Capital, through its subsidiary Asset Acceptance, as purported assignee of GE Money Bank/Care Credit, and by and through counsel, filed a Statement of Claim against Ms. Burnett in the Magistrate Court of Hall County, Georgia, Case No. MV2015153113P.  The Statement of Claim alleged a claim against Ms. Barnett in the amount of $6,927.12 in principal, plus $110.50 in "costs to date."

160.   Attached to the complaint filed against Ms. Burnett was an "Affidavit" signed by Asset Acceptance "employee" Heather Andrus and dated January 28, 2014.  Ms. Andrus's affidavit stated that she was "competent to testify" in support of Asset Acceptance's claim against Ms. Burnett "based upon personal knowledge" of the "business records associated with the" GE Money account allegedly owed by Ms. Burnett.  This language is false and misleading,

because Ms. Andrus did not have personal knowledge of the debt or any Actual Evidence.

161.   Also attached to the complaint were documents demonstrating that Asset Acceptance was a secondary debt buyer with respect to the GE Money account allegedly owed by Ms. Burnett.

162.   Also attached to the complaint was a single purported GE Money/Care Credit account statement, for the "closing date" of "07/16/2010," which did not list any charges, payments, or reason for the stated balance.  Asset Acceptance did not include any evidence that the document was placed in the United States mail or that Ms. Burnett ever received it.

163.   Ms. Burnett denies that she owes this alleged debt.

## AS FOR A FIRST CAUSE OF ACTION

## FAIR DEBT COLLECTION PRACTICES ACT
### (Against all Defendants)

164.   Plaintiffs repeat and reallege each and every paragraph set forth above as though fully set forth herein.

165.    Plaintiffs and the absent class members are "consumers" as that term is defined by 15 U.S.C. § 1692a(3) of the FDCPA.

166.   Defendants are operating as "debt collectors" as that term is defined by 15 U.S.C. § 1692a(6) of the FDCPA.

167.   The FDCPA was enacted to stop "the use of abusive, deceptive and unfair debt collection practices by many debt collectors."  15 U.S.C. § 1692(a).

168.   15 U.S.C. § 1692e of the FDCPA provides sixteen specific and nonexclusive prohibited debt collection practices, and generally prohibits a debt collector from "us[ing] any false, deceptive, or misleading representation or means in connection with the collection of any debt."  Among the acts prohibited are: the false representation of "the character, amount, or legal status of any debt" (15 U.S.C. § 1692e(2)(A)); "[t]he false representation or implication . . . that any communication is from an attorney" (15 U.S.C. § 1692e(3)); threatening "any action that cannot legally be taken" (15 U.S.C. § 1692e(5)); and using "any false representation or deceptive means to collect or attempt to collect any debt" (15 U.S.C. § 1692e(10)).

169.   The FDCPA prohibits debt collectors from "us[ing] unfair or unconscionable means to collect or attempt to collect any debt."

170.   Defendants violated the FDCPA by making false and misleading representations, and engaging in unfair and abusive practices.   Defendants' violations include, but are not limited to, the following:

   a. misrepresenting, directly or indirectly, expressly or by implication, that Defendants had verified that the debt was the accurate amount, owed by the

that consumer, and collectible within the statute of limitations;

b.  misrepresenting, directly or indirectly, expressly or by implication, that Defendants when filing debt collection lawsuits intended to and could prove their claims against Plaintiffs and the other Class Members;

c.  participating in the preparation and filing of fraudulent, deceptive, and misleading affidavits and affirmations in order to obtain tens of thousands of default judgments against Plaintiffs and their fellow Class Members in order to obtain settlements from Plaintiffs and members of the class;

d.  seeking and obtaining default judgments against Plaintiffs and their fellow Class Members when Defendants lacked admissible evidence constituting a prima face case as to their causes of action and the precise amount allegedly owed;

e.  garnishing wages and bank accounts as a result of default judgments that were obtained without reviewing or having sufficient admissible evidence of Defendants' claims;

f.  negotiating settlements using the bargaining advantage gained from the filing of sham lawsuits, the submission of materially false and misleading affidavits, and/or judgments obtained by means of materially false or misleading statements.

171.   The acts and practices herein set forth were deceptive, misleading, and fraudulent.  Plaintiffs and the other members of the Class have been damaged as a result of Defendants' violations, and are entitled to relief as provided for by 15 U.S.C. § 1692k.

## AS FOR A SECOND CAUSE OF ACTION

**RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT**
**(CIVIL REMEDIES)**
**(Against All Defendants)**

172.   Plaintiffs repeat and reallege each and every paragraph set forth above as though fully set forth herein.

173.   Plaintiffs and the other members of the Class are natural persons, and thus are each a "person" as that term is defined by the Racketeer Influenced and Corrupt Organizations Act ("RICO"), *see* 18 U.S.C. § 1961(3).

174.   Defendants are corporate entities, and thus are "person[s]" as that term is defined by RICO, *see* 18 U.S.C. § 1961(3).

**The Enterprise**

175.   Upon information and belief, Encore Capital, including its subsidiaries, and C&W are two distinct groups of persons that together constitute an "enterprise" as that term is defined by RICO, *see* 18 U.S.C. § 1961(4).  Each defendant is employed by or associated with this enterprise ("Enterprise").

66

176.   Upon information and belief, Encore Capital and C&W, taken together, are an association-in-fact pursuant to RICO, *see* 18 U.S.C. § 1961(4).

177.   The purpose of the Enterprise is to obtain moneys from Plaintiffs and the other members of the Class through fraudulent means.  These means include the filing of sham lawsuits, the submission of fraudulent affidavits in support of those lawsuits, and/or fraudulently obtaining judgments based on Defendants' false and misleading conduct.  Defendants leverage these fraudulently obtained default judgments into wage and bank account garnishments, among other methods of extracting money from Plaintiffs and the other members of the Class.

178.   This fundamental goal of the Enterprise is effectuated as follows: (1) Encore Capital purchases junk debts; (2) Encore Capital, through both its in-house attorneys and outside counsel (including C&W), commences debt-collection actions in state and local courts, despite lacking sufficient corroborative admissible evidence and/or personal knowledge thereof; (3) employees of Encore Capital, at counsel's direction, fill out the boilerplate affidavits that falsely imply actual review and personal knowledge of sufficient corroborative admissible evidence; (4) counsel acting on Encore Capital's behalf submit these materially misleading affidavits in support of complaints or motions for default judgments; (5) Defendants obtain judgments to which they are not entitled; (6) Encore Capital and

counsel use the fraudulently obtained judgments to, among other things, garnish consumer-defendants' wages and bank accounts, or use them as bargaining tools to force settlement; (7) money is thus extracted from these consumer-defendants, often in the form of wage garnishments; (8) if outside counsel, such as C&W, has represented Encore Capital in a matter, it earns a contingency fee on the money unlawfully extracted from the consumer-defendant; and (9) Encore Capital's ill-gotten gains allow it to purchase even more junk debt from the debt sellers, which not only strengthens the financial positions of the Enterprise's individual participants, but also increases the efficiency with which the Enterprise achieves its fundamental goal.

179.   The relationships between the participants in the Enterprise are longstanding and ongoing.

180.   The Enterprise has for many years—but, at the very least, since 2009—been engaged in, and continues to engage in, activities that affect interstate commerce.  The Enterprise, which is in violation of RICO, has been, and remains, longstanding, continuous and open-ended.

**Pattern of Racketeering Activity: Mail Fraud, Wire Fraud, and Bank Fraud**

181.   Defendants, individually and collectively, through their participation in the Enterprise, have engaged, directly or indirectly, in a pattern of racketeering

activity, as described below, in violation of 18 U.S.C. § 1962(c) & (d).

182.   Defendants, acting individually and as participants in the Enterprise, have devised and perpetuated a scheme to deceive consumers, judicial systems, and law enforcement officials, and to obtain money or property through false or fraudulent pretenses and representations.  This scheme includes, but is not limited to, the following acts:

a.  filing scattershot sham lawsuits in state and local courts;

b.  participating in the preparation and filing of affidavits falsely implying personal knowledge and actual review of account-level documentation relevant to debts allegedly owed by Plaintiffs and the other members of the Class, when in fact no such personal knowledge is possessed and no such actual review has occurred;

c.  filing these materially misleading affidavits for the purpose of fraudulently securing default judgments against Plaintiffs and the other members of the Class;

d.  obtaining judgments under the false pretense of having reviewed sufficient evidence;

e.  using these fraudulently obtained default judgments to compel garnishments of the wages of Plaintiffs and the other members of the

Class;

    f.  using the interstate mails and wires to receive their fraudulently obtained gains.

183.  Defendants, acting individually and as participants in the Enterprise, have made fraudulent misrepresentations on specific occasions, including: on or about July 27, 2015, Defendants filed a Statement of Claim against Mr. Vega, which filing contained an affidavit by an Encore Capital employee in which that affiant falsely stated that there existed sufficient documentation of a debt and that she had personal knowledge of, and had herself reviewed, the account-level documentation pertinent to Encore Capital's claim against Mr. Vega.

184.  Defendants, acting individually and as participants in the Enterprise, have used the mails and wires and have caused the mails and wires to be used, or reasonably knew that the mails and wires would be used, in furtherance of the fraudulent scheme as described above.  For example:

    a.  Upon information and belief, on or at some point shortly before June 3, 2015, C&W, using either the interstate mails or the wires, contacted Encore Capital so as to request that Encore Capital produce the materially misleading affidavit ultimately created by Sonja Willieams for use in the collection lawsuit against Mr. Vega.

b.  Upon information and belief, on or at some point shortly before July 29, 2015, C&W, using either the interstate mails or wires, caused the Gordon County Sheriff's Office to direct one of its deputies to serve a copy of the Encore Capital lawsuit against Mr. Vega at Mr. Vega's home address.

c.  Upon information and belief, on or at some point shortly after January 6, 2016, C&W either used the interstate mails to send Mr. Vega a copy of the summons of garnishment against him, and/or used the interstate mails or wires to cause Mr. Vega to be personally served with a copy of same.

d.  Upon information and belief, between March 3, 2016 and April 6, 2016, Encore Capital used the interstate mails or wires to receive the moneys over which it had improperly secured control via the garnishment resulting from its fraudulently obtained judgment against Mr. Vega.

e.  Defendants have used the mails and wires on tens, if not hundreds, of thousands of other occasions that Plaintiffs cannot identify presently, but that are known to Defendants.[48]

---

[48]  *See also supra* ¶¶ 128–152, 155–162.

185.   Defendants have used the mails and wires in connection with every default judgment, every garnishment, and every payment by check or credit card that they have fraudulently obtained, and each such use has furthered the fraudulent scheme and enabled Defendants to take money and/or property from Plaintiffs and the other members of the Class through misrepresentations and false pretenses.

186.   Upon information and belief, Encore Capital and C&W each have specific knowledge that the mails and wires have been, and are being, utilized in furtherance of the overall purpose of executing the fraudulent scheme, and/or that it was reasonably foreseeable that the mails and wires would be so used, because the governing state-level civil procedure law, including O.C.G.A. § 18-4-60 et seq., have required that the mails and/or wires be utilized in conjunction with the prosecution of civil actions such as those that Defendants have prosecuted against Plaintiffs and the other members of the Class.  It would be nearly impossible to obtain a garnishment without at least half-a-dozen uses of the mails and wires.

187.   Further, the Enterprise has engaged in bank fraud.  Defendants, acting individually and as participants in the Enterprise, have obtained moneys and/or other property under the custody or control of a financial institution by means of misrepresentations and fraudulent pretenses, in furtherance of the scheme as

described above.   For example: at some point between January 6, 2016 and approximately February 1, 2016, C&W—having filed a garnishment action against Mr. Vega on the basis of the judgment fraudulently obtained through the use of the materially misleading affidavit attested by Ms. Williams—directed Mr. Vega's employer, Lowes Home Centers, to cause the diversion, for Encore Capital's benefit, of moneys that would otherwise flow from Lowes's bank account to Mr. Vega as wages for work performed.

188.   Defendants have, through fraudulently suing and obtaining default judgments against Plaintiffs and the other members of the Class, improperly obtained moneys and/or other property that was under the custody or control of financial institutions on a number of occasions that Plaintiffs cannot ascertain presently, but that is known to Defendants.

189.   Each of the thousands of uses of the mails and wires, and of instances of improperly obtaining control of moneys and/or other property under the custody or control of financial institutions, that occurred in connection with the fraudulent scheme as described above, spanned a period of at least four years, and constitutes a separate instance of, respectively, mail fraud within the meaning of 18 U.S.C. § 1341, wire fraud within the meaning of 18 U.S.C. § 1343, and bank fraud within the meaning of 18 U.S.C. § 1344, and thus is also a predicate act, which acts, taken

together, constitute a "pattern of racketeering activity" for the purposes of 18 U.S.C. §§ 1961(1), 1961(5) & 1962.

190.   The acts of racketeering activity that occurred in connection with the fraudulent scheme as described above took place after the effective date of RICO, 18 U.S.C. § 1961 et seq., and on countless occasions over a substantial time period within ten years of each other.  These acts of racketeering are an ongoing part of Defendants' regular way of doing business.  The predicate acts have been, and will be, repeated over and over again.

**Relationship of the Pattern of Racketeering Activity to the Enterprise**

191.   As detailed above, the purpose of the Enterprise is to file scattershot sham litigation, to secure judgments through fraudulent means, and to use those fraudulently obtained judgments to extract money and/or property from Plaintiffs and the other members of the Class, including through wage garnishments.

192.   The pattern of racketeering activity described above is integral to the fraudulent scheme that Defendants perpetuate.  Without engaging in mail and wire fraud, Defendants would be unable to sue and secure judgments against their victims.  Without engaging in bank fraud, Defendants would be unable to turn their judgments into profits.

193.   Defendants, individually and as participants in the Enterprise, have

each conducted or participated, directly or indirectly, in the conduct of the Enterprise's affairs through the pattern of racketeering activity described above. As such, each Defendant has violated 18 U.S.C. § 1962(c).

194.   In addition, each Defendant has knowingly agreed and conspired to violate the provisions of 18 U.S.C. § 1962(c), including through the numerous predicate acts of mail, wire, and bank fraud as described above, and has thus violated 18 U.S.C. § 1962(d).

195.   As a direct and proximate result of the RICO violations described herein, Plaintiffs and the other members of the Class have suffered considerable injuries.   They have been deprived of due process.   They have had money judgments unlawfully entered against them.   They have had their wages and bank accounts unlawfully garnished, or have been forced to make payments on debts, fees, and interest they do not owe.   Their credit scores have been negatively affected, perhaps irreparably.   The list goes on.   These extreme and unjust consequences of Defendants' improper conduct in violation of 18 U.S.C. § 1962(c) & (d) amount to injury to property of Plaintiff and the other members of the class within the meaning of 18 U.S.C. § 1964.

196.   Defendants' misrepresentations to the judicial system secured the money judgments that caused concrete injury to the property of Plaintiffs and the

other members of the Class.  As a result, the actions of Defendants in violation of

18 U.S.C. § 1962(c) & (d) have caused Plaintiffs and the other members of the

Class to suffer damage to their property within the meaning of 18 U.S.C. § 1964.

197.   Defendants' conduct has involved, and continues to pose, a threat of

long-term criminality, as it is believed to have commenced more than a decade

ago, and has continued through to the present.  The pattern of racketeering as

described above has been directed towards tens, if not hundreds, of thousands of

persons, including Plaintiff, and this pattern has spanned many years.

For the violations of 18 U.S.C. § 1962 described herein, Plaintiffs and the

other members of the Class are entitled to recover compensatory and treble

damages in an amount to be determined at trial, and to a prospective order

directing Defendants to disgorge their ill-gotten gains in order to deter them from

engaging in similar conduct in the future.

## AS FOR A THIRD CAUSE OF ACTION

### UNJUST ENRICHMENT
### (Against All Defendants)

198.   Plaintiffs repeat and reallege each and every paragraph set forth above

as though fully set forth herein.

199.   Plaintiffs and the other members of the class have paid substantial

amounts to Encore Capital and C&W in the form of garnishments and attachments

from default judgments, as well as settlements obtained through the use of fraudulent, deceptive, and misleading affidavits and affirmations against Plaintiffs and members of the class, as described above.

200.   Defendants gained monetary benefits in the form of payments on such default judgments and settlements, as well as the resulting fees, to which the Defendants were not entitled.  Defendants never possessed, or could ever possess, the prima facie evidence necessary to prove claims brought against Plaintiffs and the Class.  Thus, Defendants would have sustained no monetary benefit at all, had they not manipulated local and state court systems.

201.   Allowing Defendants to retain these monetary benefits, obtained through fraud, deceit, or misrepresentation, would be unjust.  Defendants should not be unjustly enriched and the monies collected should be returned to the Plaintiffs and members of the class.

## TOLLING OF THE STATUTES OF LIMITATIONS

**Discovery Rule Tolling**

202.   Plaintiffs could not have discovered through the exercise of reasonable diligence, within the time period of any of the applicable statutes of limitation, that Defendants had perpetrated their fraudulent scheme against them.

203.   Among other things, Plaintiffs did not know, and could not have

known, that Defendants' litigation against them was never intended to be prosecuted through to trial, or that Defendants' employees who fill out Defendants' affidavits do not actually conduct a review of any account-level documentation.

204.   Therefore, the running of all applicable statutes of limitations have been suspended with respect to any claims that Plaintiffs and the other members of the Class have as a result of Defendants' fraudulent scheme by virtue of the discovery rule doctrine.

### Fraudulent Concealment Tolling

205.   Throughout the time period relevant to this action, Defendants affirmatively concealed from Plaintiffs, state and local courts, and the other members of the Class the fraudulent scheme described herein.  As such, neither Plaintiffs nor the other members of the Class could have discovered, even upon reasonable exercise of diligence, that Defendants had secured default judgments against them through the fraudulent scheme described herein.

206.   Among other things, the false and misleading statements contained in the affidavits that were created by Defendants' employees, and that C&W, and Encore Capital's other outside law firms, filed on Encore Capital's behalf in support of Encore Capital's claims against Plaintiffs and the other members of the Class, concealed the existence of Defendants' fraudulent scheme.

78

207.   Therefore, the running of all applicable statutes of limitations have been suspended with respect to any claims that Plaintiffs and the other members of the Class have as a result of Defendants' fraudulent scheme by virtue of the fraudulent concealment doctrine.

<u>**PRAYER FOR RELIEF**</u>

**WHEREFORE**, Plaintiff, on behalf of himself and all others similarly situated, demands judgment as follows:

i)   Declaring this Action to be a proper plaintiffs' class action, declaring Plaintiffs to be proper representatives of the Class, and declaring Plaintiffs' Counsel to be class counsel;

ii)   On the First Cause of Action, under the FDCPA, awarding Plaintiffs and the other members of the Class actual, statutory, and punitive damages as provided by 15 U.S.C. § 1692k;

iii)   On the Second Cause of Action, under RICO, awarding Plaintiffs and the other members of the Class actual and treble compensatory and punitive damages in an amount to be determined at trial;

iv)   One the Second Cause of Action, under RICO, granting injunctive relief directing Defendants to cease similar unlawful conduct in the future;

v)   On the Third Cause of Action, for Unjust Enrichment, requiring Defendants to pay full restitution to all members of the proposed Class to the extent that Defendants have collected monies upon the purported debts and/or default judgments entered;

vi)   Awarding Plaintiffs costs and expenses, including reasonable attorneys' fees and expenses; and

vii)  Granting such other and further relief as the Court might deem just and proper.

Dated:    Suwanee, Georgia
          November 14, 2016

                              Respectfully submitted,

                              **LAW OFFICES OF E. TALLEY GRAY**

                              /s/   E. Talley Gray
                              E. Talley Gray (GA Bar No. 53660)
                              3449-E Lawrenceville-Suwanee Road
                              Suwanee, GA 30024
                              Tel: (678) 428-4868
                              talleygray@gmail.com

                              *Local Counsel*

                              **FRANK LLP**
                              Gregory A. Frank (Pro Hac Vice)
                              Marvin L. Frank
                              275 Madison Avenue, Suite 705

New York, New York 10016
Tel: (212) 682-1853
Fax: (212) 682-1892
gfrank@frankllp.com
mfrank@frankllp.com

*Lead Counsel for Plaintiffs and the Class*